Michael **BALLARIS**, Plaintiff–Appellant,

v.

**WACKER SILTRONIC CORPORATION, a foreign corporation,** Defendant–Appellee.

No. 02–35956.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 3, 2004.

Filed June 3, 2004.

Jacqueline L. Koch, Koch & Deering, Portland, Oregon, and J. Dana Pinney,

Bailey, Pinney & Associates, Tualatin, OR, for the plaintiff.

Bruce L. Campbell and John F. Neupert, Miller Nash LLP, Portland, OR, for the defendant.

Before: REINHARDT, SILVERMAN, and CLIFTON, Circuit Judges.

REINHARDT, Circuit Judge.

Michael Ballaris, on behalf of himself and others similarly situated, sued Wacker Siltronic Corporation to recover: (1) unpaid overtime wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; (2) unpaid overtime wages under the Oregon wage and hour laws, Or.Rev. Stat. §§ 652.140 and 652.150; and (3) equitable remedies and unpaid benefits on account of the company's failure to keep accurate records and to make contributions to employee benefit plans, as required by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. The district court granted Wacker summary judgment on all claims.

Plaintiffs assert three principal errors on appeal. They contend that the district court erred in concluding that: (1) paid-lunchtime compensation did not constitute remuneration regularly received for employment and is therefore excludable from the regular rate of pay used to calculate overtime compensation; (2) time spent by employees changing into and out of plant uniforms at the work-site was not "work-time" under the FLSA, and therefore is not compensable; and (3) the employer could lawfully credit the "paid lunch" time payments against overtime compensation due the employees.[1] We affirm in part, reverse in part, and remand.

**I.**

Wacker manufactures silicon wafers for the computer industry.[2] Its facility in Portland, Oregon has two fabrication plants: "Fab 1" and "Fab 2." Plaintiffs are employees of Wacker who work or who have worked in Fab 1 or Fab 2.

*a. Cleanrooms*

Part of the silicon wafer manufacturing process takes place in "cleanrooms"—environments that have few of the air-borne impurities that exist in the ambient air. Cleanrooms are classified by the number of particles of contamination permitted per cubic foot. Therefore, a Class 10,000 cleanroom has more impurities than a Class 10 cleanroom.

All employees who work in cleanrooms must wear gowns to help maintain the environment. The gowns worn in the cleanrooms are referred to as "bunny suits." The process of preparing oneself to enter the cleanroom is called "gowning." More gowning is required in a Class 10 cleanroom than in a Class 10,000 cleanroom. For example, employees who work in a Class 10,000 cleanroom complete eight steps before entering, five of which involve "donning gowns," whereas employees who work in a Class 10 cleanroom must complete ten to twelve steps. Some, but not all, of the cleanrooms have an air shower

---

1. Because we conclude that an employer violates the FLSA when it applies payments for a "paid lunch" period to overtime (or any other) compensation, we need not reach the other argument raised by plaintiffs on appeal, namely that a violation of state law provisions affording additional benefits to employees is also a violation of the FLSA.

2. The facts as set forth in Section I are undisputed unless otherwise noted.

that employees must proceed through prior to entering the cleanroom. During the relevant times, Wacker required Fab 1 and 2 employees who worked in cleanrooms to complete the gowning process prior to beginning their shifts or prior to clocking in.

### b. Fab 1

Fab 1 has 18 cleanrooms: seven Class 10,000, four Class 1,000, four Class 100, and three Class 10. Fab 1 employees enter the building and proceed to the gowning area directly outside of the cleanroom manufacturing area. Fab 1 employees are not required to wear plant uniforms under their bunny suits.

### c. Fab 2

Fab 2 has seven cleanrooms. The employees in Fab 2 are divided into three teams. Each team has a different gowning area. Unlike Fab 1 employees, Fab 2 employees are required to wear plant uniforms, consisting of a polo shirt, pants, and shoes under their bunny suits. During the relevant time period, Fab 2 employees were required to wear their street clothes to work and to change into and out of their plant uniforms in a locker room located between the Fab 2 entrance and the gowning areas. The time for employees to walk from the locker rooms to the gowning areas varies from approximately 15 seconds to four minutes.

Upon accepting employment with Wacker, Fab 2 employees are given an introductory manual, which contains instructions and warnings regarding the plant uniforms. The manual states that: "Everyone in the building is required to wear the plant uniform." It provides five reasons why plant uniforms must be worn at all times while employees are on-site:

(1) The uniform supports [Wacker's] objective to be the cleanest Silicon manufacturer world-wide.

(2) The use of a uniform attracts industry attention and shows [Wacker's] commitment to a clean philosophy.

(3) To be the best of the breed to [Wacker's] customers based on the benchmarking of our Wasserburg facility and Toshiba.

(4) To limit potential cleanroom contamination from the clothing worn under the cleanroom suits. Guidelines for personal clothing become obsolete with a controlled plant uniform.

(5) To be the industry leader in working environments, providing [Wacker] customers with the highest quality products, and making Wacker the preferred choice among vendors.

In a separate document, the plant uniforms are listed as among the garments required for an employee to enter any of the cleanrooms or adjacent areas.

Wacker informed Fab 2 employees that: "Plant shoes and uniforms are NOT to be worn outside the building, except in an emergency. This includes going to the other buildings on site, while smoking or going home at the end of the day." The company further notified employees that: "Security will be monitoring the entrance and exit so that [employees] do not walk out with [their] plant shoes on. [It] will also monitor Wacker personnel for wearing the plant uniform."

### d. Shifts and "Pass–Down" Time

Wacker operates 24 hours per day in what it calls "twelve-hour" shifts. The shifts officially change at 7 a.m. and 7 p.m. Despite the official start time, the company requires employees who work in cleanrooms to report to their work stations by 6:50 or 6:55 to receive a "pass down" briefing about any manufacturing problems that occurred during the prior shift. Before reporting to their work stations for

the briefing, Fab 1 and Fab 2 cleanroom employees swipe in, put on a bunny suit (or a bunny suit and plant uniform, as the case may be), and pass through an air shower.

At the end of the shift, the company requires these employees to remain in the cleanroom until 7:00 to participate in the "pass down" briefing with the next shift.[3] After leaving the manufacturing floor, the employees remove their bunny suits and "clock out" outside of the cleanroom gowning area. Fab 2 employees then walk from their stations to the locker rooms to change out of the plant uniform and back into street clothes.

Wacker employees alternate between working three shifts one week and four shifts the next. On the weeks that employees work four shifts, they work more than 40 hours per week.

#### e. Amount of Time for Changing Into and Out of Gowns and Uniforms

The exact amount of time required to change into and out of company—required attire and to complete the gowning process differs for Fab 1 and Fab 2 employees. The parties appear to agree that it takes approximately 30 minutes each day to perform the gowning activities that are required of both groups,[4] but they disagree about how much additional time is required for Fab 2 employees to change into and out of their plant uniforms and to walk to and from their stations. Fab 2 employees estimate an additional 20 to 30 minutes per day for these activities. Prior to clocking in, they estimate, it takes 10 to 15 minutes to change into their plant uniforms in the locker room and walk to the assigned cleanroom gowning area. After clocking out, they assert, it takes 10 to 15 minutes to return to the locker room and change from their plant uniforms back to street clothes.[5]

#### f. Time Paid & Breaks

##### i. Prior to July 29, 2001

###### a. Paid Time

Prior to March of 1999, Wacker used manual time cards to account for employees' hours on-site. However, no matter what the actual time card showed, Wacker paid employees for only 11.5 hours per day, 10 hours at a regular rate of pay and 1.5 hours at the overtime rate. In March of 1999, Wacker installed time clocks outside the cleanroom gowning areas, but continued to pay employees for 11.5 hours of work per shift[6] regardless of whether they worked more than 11.5 hours.[7]

---

**3.** Time records show that some employees did not always stay until 7.

**4.** Insofar as there is a disagreement over the amount of time required to conduct gowning activities, the issue presents a dispute of material fact. However, we note that plaintiffs have conceded that it would be appropriate to use punch-card time records to establish the total estimated time that Fab 1 employees worked, and a quick review of such records shows that the time spent on gowning activities is in the area of 30 minutes. In any event, the time is not *de minimis*. *See* Section III C., *infra*.

**5.** As with the case of the time required for gowning activities, any dispute over the time involved is material, and requires resolution by the finder of fact.

**6.** Individuals who had prior approval to work overtime were exempted from this policy.

**7.** There is conflicting testimony as to why Wacker instituted this rounding system and its rationale for continuing to pay employees for 11.5 hours per day even though, on a normal day, they were on-site for at least 12.5 hours, including an uncompensated half-hour lunch period. Christine Carden, who oversees Wacker's payroll department, stated that the company created this system, because it assumed that the employees were at the plant for 12.5 hours, but then subtracted an hour

### b. Breaks/Lunches

During the relevant time period, Fab 1 and 2 employees received two 20–minute paid breaks (half of which were spent doffing and donning the bunny suits).

They also received two meal periods: a 30–minute unpaid meal period and a 30–minute paid meal period. According to Ballaris, employees were only allowed to go outside during the unpaid lunch.

### ii. July 29, 2001–present

On July 29, 2001, after the lawsuit was filed, Wacker changed its policies; Ballaris asserts no claims for the period after July 29, 2001.

Wacker changed its time keeping system so as to base its pay directly on entry and exit swipe times and ended the rounding process. The scheduled breaks for employees were changed as follows: a 10–minute paid break; a 40–minute unpaid lunch; a 10–minute paid break; and a 20–minute paid break. Employees have been instructed to de-gown and clock out no later than 7, unless they are pre-approved to work overtime.

Wacker also changed its plant uniform policy. Fab 2 employees are now allowed to wear their plant uniforms to and from work and no longer have to change at the plant. Fab 2 employees' street shoes may now either be covered with shoe covers or the employees may change into company uniform shoes in the locker room.

## II.

Michael Ballaris, a former employee of Wacker, who worked in a cleanroom, brought this action on behalf of himself and other similarly situated employees. He alleged that Wacker had a policy and practice of failing to pay its workers overtime wages for the time spent on gowning activities and putting on and taking off plant uniforms. He asserted that the company required its cleanroom employees to be "on the plant floor" for the "pass down" briefing before the start of their scheduled shift and failed to compensate them for this time as well. He further alleged that when these employees clocked in prior to the start of the shift, supervisors altered their time cards. He also complained that the company erroneously computed the overtime rate. Finally, he asserted that, as a result of its failure to pay wages due, Wacker also withheld contributions to the employee benefit plan in violation of ERISA.[8]

■ Under 29 U.S.C. § 216(b) of the FLSA, the district court certified a "collective action" for all hourly employees of Wacker assigned to work in cleanrooms from November 27, 1997, to November 27, 2000, for claims under the FLSA.[9] The

---

for lunch from that time, i.e., the uncompensated half-hour lunch period and the half-hour paid one. However, team leader Stanley Meeks stated that the company considered employees to be working 12 hours and 10 minutes, and that they subtracted 40 minutes from that total. Meeks was told that one of the lunch periods was used to offset compensable time.

8. Plaintiffs are participants in employee benefit plans, as defined by ERISA, 29 U.S.C. § 1002(3), in which benefits are determined

in part by wages earned or hours worked by the employees, or both.

9. The FLSA allows for a type of class action, known as a "collective action," for employees who are similarly situated to a plaintiff and who file a consent in writing with the court (i.e.,"opt-in" plaintiffs). See 29 U.S.C. § 216(b). If employees do not opt-in by filing such consent, they are not bound by the outcome of the collective action and may bring a subsequent private action. EEOC v. Pan Am. World Airways, Inc., 897 F.2d 1499, 1508 n.

court accepted supplemental jurisdiction over Ballaris's state law claim brought under Oregon's wage and hour law. It did not exercise supplemental jurisdiction over the opt-in plaintiffs' state law claims.

Plaintiffs moved for summary judgment on the FLSA claims, seeking a determination that Wacker unlawfully failed to pay for time spent in donning and doffing bunny suits and "pass down" briefings, and time spent by Fab 2 employees putting on and taking off their plant uniforms. They also sought a determination as to the proper rate of overtime pay. Wacker filed a cross-motion for summary judgment as to all claims. It asserted, *inter alia,* that it need not provide any pay for the time its employees spent on the activities identified by plaintiffs because it was entitled to credit their paid-lunch hour compensation against all such hours of work.

The court denied plaintiffs' motion and granted Wacker's in part, holding that: (1) the time spent by Fab 2 employees in changing into and out of their plant uniforms was not compensable work time because, under the Portal–to–Portal Act, it was not an integral and indispensable part of the job; (2) Wacker was entitled to credit the paid meal period compensation as an offset against time worked for which it had not paid, specifically the time spent before and after the "official" shift donning and doffing bunny suits and participating in "pass down" briefings; and (3) *Marshall*

*v. Valhalla Inn,* 590 F.2d 306 (9th Cir. 1979) did not apply and the paid meal period did not have to be included in determining the regular rate of pay (and thus the overtime rate).

The court concluded that, "[p]laintiffs must be paid from when they enter the cleanroom gowning area to put on a bunny suit until they remove the bunny suit and leave the gowning area." [10] However, because, at the time, the evidence in the record was unclear as to the number and length of meal periods (and thus the amount of compensation that could, in the court's view, be credited against hours worked), the court believed that it could not determine whether Wacker had violated the FLSA.

After further briefing, Wacker filed a second motion for summary judgment as to all remaining claims. Because it appeared that crediting payments for the paid lunch period against overtime earned would generally leave no overtime unpaid,[11] the court granted the motion, and entered an order dismissing Ballaris's state and federal claims with prejudice and dismissing the opt-in plaintiffs' federal claims with prejudice.

## III.

### A. Waiver

Before reaching the merits, we address Wacker's contention that plaintiffs waived

---

11 (9th Cir.1990), *cert. denied,* 498 U.S. 815, 111 S.Ct. 55, 112 L.Ed.2d 31 (1990).

**10.** Wacker does not challenge this determination on appeal.

**11.** Because the parties and the district court have treated this case as presenting the issue whether the "paid lunch" period may be credited against overtime compensation, we apply that form of analysis in this opinion. We note, however, that the time periods that Wacker seeks to credit the paid lunch com-

pensation against do not necessarily correspond to hours that ordinarily must be compensated at an overtime rate. Nevertheless, the specific time against which Wacker seeks to credit the compensation is irrelevant. As we explain infra at III.D, the FLSA prohibits crediting the lunch period amounts against any wages earned. 29 U.S.C. § 207(h). The *amount of additional compensation due* and the applicable rate for the hours involved are matters to be resolved by the district court on remand.

some of their arguments in the district court. Specifically, Wacker asserts that plaintiffs did not: (1) cite to the appropriate portions of the Code of Federal Regulations to support their argument that the FLSA prohibits use of the paid lunch period to offset overtime compensation; or (2) assert that Wacker failed to pay them at the proper overtime rate under *Marshall v. Valhalla Inn,* 590 F.2d 306 (9th Cir. 1979).

Plaintiffs have argued throughout the proceedings, that the FLSA prohibits the use of a paid lunch period to offset overtime (or other) compensation owed to employees. "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise argument they made below." *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). Plaintiffs have presented no new claim on appeal. Wacker complains only that they failed to cite a regulation that supports what has been their consistent claim throughout. Where, as here, the question presented is one of law, we consider it in light of "all relevant authority," regardless of whether such authority was properly presented in the district court. *Elder v. Holloway,* 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994).

In any event, plaintiffs did cite to the regulation in question, and urged its applicability, in the district court. In their motion to amend findings and conclusions of law with respect to the first summary judgment motion, plaintiffs cited to 29 C.F.R. § 778.320(b) and argued that under that regulation the payment for the lunch period could not be used to offset overtime compensation. Wacker responded, stating, among other things, that citation to the federal regulation did not provide anything new for the district court to consider. The district court, apparently agreeing with Wacker, summarily denied the motion, stating that no additional briefing was necessary. Thus, Wacker's first waiver argument is without merit.

Wacker also asserts that plaintiffs did not specifically allege that they were not paid the proper overtime rate. However, the district court's order states expressly that, "[p]laintiffs [ ] argue[d] that Wacker must factor the paid lunch time into the hourly rate, resulting in a higher overtime rate for its employees." After considering the applicability of *Valhalla,* the court disagreed. Accordingly, the district court was clearly "on notice" of this aspect of the claim and expressly ruled against plaintiffs. *See Nelson v. Adams USA, Inc.,* 529 U.S. 460, 469, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000) ("[Principle of waiver only] requires that the lower court be fairly put on notice as to the substance of the issue."). Thus, Wacker's second waiver argument regarding the overtime rate is frivolous.

## B. Calculation of the Regular Rate

First, plaintiffs contend that the district court erred in concluding that (1) Wacker "properly" compensated plaintiffs for their time, i.e., applied the proper overtime rate, and (2) *Valhalla* does not control. The FLSA requires an employer to compensate its employees for overtime "at a rate not less than one and one-half times the *regular rate* at which he is employed." 29 U.S.C. § 207(a)(1) (emphasis added). Calculating the regular rate entails dividing the remuneration paid by the number of hours worked.[12] *See* 29 U.S.C. § 207(e).

---

12. For example, if an employee receives $400 dollars a week for 40 hours of "work," his regular rate is $10 and his overtime rate is $15.

Wacker excluded the compensation for the lunch period when calculating the regular rate. In this case, it did not err in doing so. Our holding in *Valhalla* that an employer must include in the regular rate wages voluntarily paid to employees during meal periods, even if such lunch time is not counted as "hours worked," is not applicable here. Although the *Valhalla* court did not mention the controlling regulations, the regulation in effect when *Valhalla* was decided created a presumption in favor of including regularly received payments for hours not worked in the regular rate under most circumstances. The 1979 regulation provided:

> Since, however, [payments for hours not counted as work] are part of the employee's remuneration for his employment, section 7(e) of the Act requires *that the compensation paid for such hours be included in his regular rate of pay,* unless it appears from all the pertinent facts that the payments are of a type qualifying for exclusion therefrom under the provisions of section 7(e)(2).

29 C.F.R. § 778.320 (1979). In 1981, two years *after* we decided *Valhalla,* 29 C.F.R. § 778.320 was amended so as to provide that payments for meal periods not counted as hours worked should generally be *excluded* in computing the regular rate of pay when the parties have agreed to exclude such activities from hours worked. *Id.* Section 778.320(b) now provides:

> [T]he parties may reasonably agree that the time [spent in certain activities] will not be counted as hours worked. *Activities of this type include eating meals between working hours.* Where it appears from all the pertinent facts that the parties have agreed to exclude such activities from hours worked, payments for such time will be regarded as qualifying for exclusion from the regular rate

under the provisions of section 7(e)(2), as explained in §§ 778.216 to 778.224.

*Id.* (*amended* January 23, 1981); *see* 46 Fed.Reg. 7308. The 1981 amendments to section 778.320 effectively eliminated the presumption in favor of including payments for meal periods in the regular rate and substituted a presumption in favor of exclusion, so long as the parties "have agreed to exclude such activities from hours worked." 29 C.F.R. § 778.320 (2004) (revised in 1981). Such changes are consistent with the statutory language of 29 U.S.C. § 207(e)(2), which provides that "payments to an employee which are not made as compensation for his hours of employment" are excludable from the regular rate. *Id.*

Thus, if, under the current regulation, "it appears from all the pertinent facts that the parties have agreed to exclude [the meal period] from hours worked," then payment for the period should be excluded from the regular rate. 29 C.F.R. § 778.320(b). Here, there is no question, and the parties both agree, that the lunch period has been excluded from hours worked. Throughout the litigation, the parties treated the half-hour paid lunch period as non-working time, and plaintiffs offer no argument as to why we should treat it differently on appeal. We conclude that the payments for the lunch periods constituted an additional benefit for employees and not compensation for hours worked, and thus are properly excluded from the calculation of the regular rate under 29 U.S.C. § 207(e)(2) as interpreted by revised section 778.320.

In light of the amendments to section 778.320 adopted after our decision in *Valhalla,* we affirm the district court's determination that our earlier case is inapplicable here and reject plaintiffs' challenge to the overtime rate as calculated by Wacker.

## C. Portal–to–Portal Act

Next, plaintiffs argue that Wacker was required to compensate Fab 2 employees under the FLSA for the time spent changing into and out of their plant uniforms. They assert that wearing the uniforms was an "integral and indispensable" part of the job because Wacker required Fab 2 employees to conduct the changing activities on-site and it received the primary benefit from the dress it ordered.

Whether an activity is excluded from hours worked under the FLSA, as amended by the Portal–to–Portal Act, is a mixed question of law and fact. The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law. *Baker v. Barnard Const. Co., Inc.*, 146 F.3d 1214, 1216 (10th Cir.1998). Because there was no dispute over the nature of the activities involved, the question here is one of law, which we review de novo. *Smith v. Commissioner of Internal Revenue*, 300 F.3d 1023, 1028 (9th Cir.2002).

The Portal–to–Portal Act of 1947 amended the FLSA to exclude the following activities from "working" time:

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur prior to the time or any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a).

However, "while the Portal–to–Portal Act excluded 'ordinary' clothes-changing from compensable time, other clothes-changing that was not 'merely a convenience to the employee' and that was 'directly related to the specific work' remained compensable." *U.S. Dep't of Labor* letter, dated June 6, 2002, to Samuel D. Walker (citing 93 Cong. Rec. 2297–98 (1947)). Moreover, preliminary and postliminary activities remain compensable so long as "those activities are an integral and indispensable part of the principal activities." *See Mitchell v. King Packing Co.*, 350 U.S. 260, 262–63, 76 S.Ct. 337, 100 L.Ed. 282 (1956) (knife-sharpening in a meat-packing plant is integral and indispensable to employee's principal activity of butchering). In this regard, 29 C.F.R. § 790.8(c) provides:

> Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance. If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes *on the employer's premises* at the beginning and end of the workday would be an integral part of the employee's principal activity.

*Id.* (footnotes omitted) (emphasis added). Further, "where the changing of clothes *on the employer's premises* is required by law, *by rules of the employer*, or by the nature of the work," the activity may be considered integral and indispensable to the principal activities. *Id.* n. 65 (emphasis added).

We recently addressed the compensability of the donning and doffing of job-related apparel in *Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir.2003). In *Alvarez*, we held that donning and doffing of all protective gear was compensable worktime. *Id.* at 904. We further held that, in considering whether putting on and taking off safety goggles was excluded, the "ease of don-

ning and ubiquity of use [did] not make the donning of such equipment any less 'integral and indispensable.' " *Id.* at 903. We clarified that the term "work," as used in the FLSA, includes even "non-exertional acts." *Id.* at 902 (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S.Ct. 165, 89 L.Ed. 118 (1944) (noting that even "exertion" is not the sine qua non of "work" because "an employer ... may hire a man to do nothing, or to do nothing but wait for something to happen.")). We also made it clear that the donning and doffing of various types of safety gear, as well as the attendant retrieval and waiting, constituted "work." *Id.*

*Alvarez* was decided after the district court had filed its decision in this case. Because there was little Ninth Circuit law on this issue, the district court relied heavily on a Tenth Circuit decision,[13] which reached a contrary conclusion to the one we subsequently announced in *Alvarez*. We now re-examine the district court's conclusion under our intervening precedent.

Here, as in *Alvarez*, Wacker "required" Fab 2 workers to change into and out of their uniforms at the plant, and only at the plant, in the normal course of the employees' jobs. *Id.* at 903. Wacker issued instructions to Fab 2 employees that they must wear the plant uniforms daily and strictly enforced this requirement. Employees were prohibited from leaving the plant in their uniforms and were monitored by security cameras and guards to ensure compliance.[14] These facts weigh heavily in favor of a determination that the

activity is *not* excluded by the Portal–to–Portal Act. *See Dunlop v. City Electric, Inc.*, 527 F.2d 394, 399–401 (5th Cir.1976) (suggesting that the employer's directive to perform an action weighs in favor of compensability).

Further, this activity was performed "at both broad and basic levels" for the "benefit of [the company]." *Alvarez*, 339 F.3d at 903. The workplace introductory manual and other supporting company manuals state that the uniforms were required to limit potential cleanroom contamination, and thereby to assist the employer in ensuring the quality of the silicon chips manufactured at the plant. The uniforms were also mandated to keep the company competitive, to promote a clean internal philosophy, and to attract favorable industry attention, outcomes that clearly inured to the benefit of Wacker. As in *Alvarez*, because the plant uniforms were "required by" the employer, and because the wearing of those uniforms was for the employer's benefit, the time spent putting them on and taking them off must be included as compensable time. *Id.*

In reaching its decision below, the district court relied largely on the fact that changing into and out of plant uniforms did not require physical exertion. As discussed above, the district court's reasoning was subsequently rejected by *Alvarez*. There, we established that "work" includes even non-exertional acts. *Id.* at 902. In the case before us, it is clear that "these tasks are activity, burdensome or not, performed pursuant to [Wacker's] mandate

13. *Reich v. IBP, Inc.*, 38 F.3d 1123 (10th Cir.1994).

14. Wacker contends that, despite the clear directives and warning in the introductory manual, it did not discipline employees for failing to wear the plant uniforms. The record as to whether employees were, in fact, reprimanded is not fully developed. Although

evidence that an employee has been disciplined for the failure to follow a clear rule established by a company would weigh in favor of a finding that the activities are "integral and indispensable," such evidence is not necessary to prove that the activities are not excludable.

for [Wacker's] benefit as an employer." *Id.* at 903. As such, these activities constitute "work." We also conclude that the time spent traveling between the various cleanrooms and locker rooms, before and after changing out of plant uniforms, is compensable. *See id.*

That Fab 1 employees were not required to wear the plant uniforms does not change our analysis. The company had the discretion to determine that workers at one plant should be held to a different standard than another. Because it determined that all employees in the second plant must wear uniforms daily and must put them on and take them off on the plant premises, and it adopted that rule in order to improve overall business performance and to provide additional protections in its manufacturing process, the company, by its conduct, made such activities integral and indispensable to the job. 29 C.F.R. § 790.8(c) n. 65.

■ For these reasons, we conclude that the district court erred in finding that the time spent changing into and out of the uniforms on the company's premises was not "work" time under the FLSA. A question still remains, however, as to whether the time spent on this activity was *de minimis. See Alvarez,* 339 F.3d at 904 (holding that time spent donning and doffing safety goggles and hardhats, although essential to the job and required by the employer, is at once so insubstantial and so difficult to monitor that it is noncompensable as *de minimis* ). Here, the time is apparently not similarly insubstantial. Nor is it difficult to monitor. Plaintiffs presented evidence that some 20 to 30 minutes were spent daily by Fab 2 employees performing these tasks; Wacker disagrees but offers no estimate of its own. Because the amount of time is in dispute, there is a genuine issue of material fact to be resolved by the fact-finder on remand.

### D. Paid Lunch Period As A Credit Toward Unpaid Hours Worked

Finally, plaintiffs argue that section 7(h) of the FLSA and related federal regulations do not permit an employer to use payments for compensated lunch periods as credits toward overtime compensation. Wacker contends that such payment can offset the compensation due to the Fab 1 and 2 employees for the approximately one-half hour they spend donning and doffing "bunny suits" (as opposed to uniforms), preparing to enter and exit the cleanrooms, and participating in "pass down" briefings. In other words, Wacker argues that because it is paying plaintiffs for a half-hour lunch period, the FLSA does not require it to pay them for a half-hour of overtime they perform.[15]

As discussed, *supra,* for the relevant time periods, Fab 1 and Fab 2 employees worked, at a minimum, approximately 11.5 hours each day (including the gowning time and related activities)[16] and received a half-hour paid lunch period,[17] making a

---

15. Wacker appears to have chosen to try to credit the lunch period compensation against the payments due for these activities as a matter of litigation strategy. Its first effort was to argue that it simply was not required to pay compensation for the gowning and related activities. Only when that thesis was seriously challenged, did Wacker retreat to the argument that it could simply forego a half-hour of payments due because it compensates its employees for a paid lunch period.

16. Fab 2 employees may in fact have worked closer to 11 hours and 50 minutes per day because of the additional time required to change into and out of uniforms at the plant.

17. At oral argument, Wacker's attorney argued, for the first time, that the company had never agreed to provide its employees with a paid lunch period. This assertion is squarely contradicted by the record. *See* memorandum to Fab 2 employees (employees "receive one 40–minute paid lunch period" and one

total of 12 hours paid time on-site.[18] Despite this, in the district court and on appeal, Wacker has asserted that, under the FLSA, it need only pay its employees for 11.5 hours. In determining whether Wacker violated the FLSA, the district court concluded that the appropriate approach was to "determine how much time was worked versus how much time was paid." The district court held that the paid 30–minute lunch period was not work time, that Wacker was not required to provide that benefit under the FLSA, and that payments for the lunch period could be used to offset the approximately 30 minutes of "work-time" spent donning and doffing the bunny suits and engaging in related activities. The district court clearly erred.

■ One of the principal purposes of the FLSA is to ensure that employees are provided appropriate compensation for *all* hours worked. *See, e.g.,* 29 C.F.R. § 778.223 ("Under the Act an employee must be compensated for all hours worked."); 29 C.F.R. § 778.315 ("In determining the number of hours for which overtime compensation is due, all hours worked … by an employee for an employer in a particular workweek must be counted.… [E]xtra compensation for the excess hours of overtime work under the Act cannot be said to have been paid to an employee unless all straight time compensation due him for the non-overtime hours under his contract (express or implied) or under any applicable statute has been paid."). Here, although Wacker does not challenge the district court's ruling that employee time spent conducting gowning activities and participating in related activities is work time, it nonetheless contends that it need not compensate plaintiffs for that work but instead can simply credit it against its obligation payments due its employees for paid lunch periods. Wacker's position is untenable. First, section 7(h) of the FLSA expressly provides that sums excluded from the regular rate "shall not be creditable toward wages required under section 6 [, providing for minimum wage,] or overtime compensation required under this section." 29 U.S.C. § 207(h). Here, compensation for the paid lunch periods is excluded from the regular rate under section 7(e)(2) (*see* section III.B *supra*). Accordingly, the use of paid lunch compensation to offset wages or overtime compensation due for hours worked is in direct violation of the express provisions of section 7(h). *See Dunlop v. Gray—Goto, Inc.,* 528 F.2d 792, 794–95 (10th Cir.1976) (holding that fringe benefits in the form of paid vacations, holiday pay, biannual bonuses, and pay for health, life, and accident insurance cannot be credited toward overtime compensation due under the Act); *see also* 29 C.F.R. § 778.320 ("The

---

40–minute unpaid lunch/break period); Wacker Siltronic, Policy and Procedure Manual, 11/24/97 (showing the length of the shift as 12.0 hours, that 11.5 hours were paid, and that the employees received one "paid" meal period and one unpaid meal period each 30 minutes in length).

18. As discussed, *supra,* both Fab 1 and Fab 2 employees were generally on-site for a minimum of 12.5 hours each day, including the second half-hour lunch period that was unpaid. Both parties agree that this second lunch period is not "work" time for purposes of the FLSA, and that it should not be count-ed in determining the total hours worked, or in computing any overtime rates. It is also undisputed that, pursuant to 29 C.F.R. § 785.18, the 20 minute paid rest periods provided (10 minutes of which are used for gowning and de-gowning) *are* counted as "hours worked" for purposes of FLSA overtime compensation calculations. *Id.* ("Rest periods of short duration, running from 5 minutes to about 20 minutes, are common in industry. They are customarily paid for as working time" and "must be counted as hours worked.").

payments for [time not treated as hours worked] cannot, of course, qualify as overtime premiums creditable toward overtime compensation under section 7(h) of the Act.").

Even without section 7(h), we emphasize that it would undermine the purpose of the FLSA if an employer could use agreed-upon compensation for non-work time (or work time) as a credit so as to avoid paying compensation required by the FLSA. The Supreme Court has held that in enacting the FLSA Congress intended "to guarantee either regular or overtime compensation for all actual work or employment. To hold that an employer may validly compensate his employees for only a fraction of time consumed in actual labor would be inconsistent with the very purpose and structure" of the Act. *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597–98, 64 S.Ct. 698, 88 L.Ed. 949 (1944); *see also* 29 C.F.R. § 778.223 ("Under the Act an employee must be compensated for all hours worked."). Crediting money already due an employee for some other reason against the wage he is owed is not paying that employee the compensation to which he is entitled by statute.[19] It is, instead, false and deceptive "creative" bookkeeping that, if tolerated, would frustrate the goals and purposes of the FLSA.

### III.

In conclusion, we affirm the district court's determination that the regular rate

(and thus the overtime rate) of pay was properly calculated. We reverse, however, the determination that plaintiffs received all of the compensation due under the FLSA. The case is remanded for a determination of the amount of unpaid wages due to plaintiffs for time spent in gowning and related activities, putting on and taking off plant uniforms, traveling between cleanrooms and locker rooms, and participating in "pass down" briefings. Wacker may not offset the paid lunch period against any or all such amounts or against any other compensation otherwise due. Because Wacker appears not to have accounted properly for the hours worked, we also reverse the court's summary judgment ruling as to plaintiffs' ERISA claims. The state law claims, having been dismissed on account of the erroneous judgment with respect to the federal claims, must also be reinstated.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

19. There is only one exception to this rule. The FLSA provides that if an employer pays an employee compensation in the form of "premium rate" pay as described in 29 U.S.C. § 207(e)(5), (6), and (7) such sums "shall be creditable toward overtime compensation payable pursuant to this section." 29 U.S.C. § 207(h)(2). Premium rate pay is compensation at a rate in excess of the regular hourly rate paid for work performed outside of or in excess of regular working hours or in excess of eight hours per day or the applicable maxi-

mum work week or on weekends or holidays. *See* 29 U.S.C. § 207(e)(5), (6), and (7). The creditability of premium rate pay for hours worked against overtime compensation in general is in no manner at issue in this case. Nevertheless it is this provision that appears to have led Wacker and the district court to believe that lunch-hour pay could be credited against any or all hours worked. For a full analysis of section 207 and its relevance to the crediting of certain compensation against overtime pay, *see Dunlop*, 528 F.2d at 793–95.